Good morning, Julie Kayes on behalf of the Petersen family. Your Honors, could I reserve five minutes for rebuttal please? Sure, just so you know when it's down to five minutes you probably already know this, that's your rebuttal time. I'll try to help you watch because it sometimes gets away from everybody. I appreciate that. Again, Your Honors, may it please the court, my name is Julie Kayes and I am here on behalf of the Petersen family, the plaintiffs herein, and we respectfully ask this court to reverse Judge Layton's grant of summary judgment to the defendants in this case and to give the Petersen family the right to be heard and their day in court. Because this is an issue before the court at the summary judgment stage, the facts are important, as this court well knows, and in brief the facts are this. Stephen Petersen was standing in the middle of a deserted street in the early morning hours on June 20th of 2011. Officer McKnight, Lewis County officer, shined his spotlight from the patrol car at Mr. Petersen. McKnight thought that Stephen was possibly the subject of an attempted burglary a short time earlier, but he was unsure. McKnight stood in the V of his patrol car, that open door, spotlight shining at Mr. Petersen. He never identified Mr. Petersen by name, McKnight admitted in his deposition testimony that he was in the midst of a Terry stop. He admitted that he did not have probable cause to arrest Stephen. He admitted that he did not know that Stephen was in fact the individual involved in the attempted break-in. He admitted that he could have, but did not, give multiple verbal warnings along the lines of stop and I'll shoot, or I'll He admitted at deposition that he could have used his taser, but he did not. He admitted he... Did he say that the reason he didn't use his taser was because this individual was heavily clothed and he was uncertain whether the charge would have its intended effect? I believe he did testify to that, how... Is there contrary Secondly, McKnight admitted he could have called for backup. He had two officers roughly 22 seconds away, or less than 22 seconds... Excuse me, slightly more than 22 seconds away. He admitted that he could not arrest Stephen for failing to comply with his commands during a Terry stop. Stephen stood significantly 25 feet away from the officer. The interaction, according to the CAD, the computer-aided dispatch, lasted one minute and 10 or 11 seconds. If I were in front of a jury, I would stand here for a minute and 11 seconds and let that time tick, tick, tick by to show the fact that this wasn't an interaction that occurred in a split second. There was a full minute and 10 seconds of interaction between the two. One of the points that was made in your brief, and particularly by the experts, is that not only was there no warning, but that there was this issue about the failure to call police backup. I'm not entirely clear from your argument whether you view the failure to call police backup as part of the constitutional violation. Your Honor, as the testimony before the court, and I could go through and cite to the record the two backing officers, if you will. I think it's Deputy Smith and I think it's Deputy Anderson. I just can't recall off the top of my head. Both of them testified, and the testimony is before the court at this stage in the proceeding, that it is safer for the officer to have backup and it is safer for the subject involved to have backup, and that it is our position that calling for backup in this situation would have been a reasonable alternative, short of the use of deadly force, that would have assisted in resolving the situation without the need for force. So you're saying that in and of itself, failure to call for backup could be a basis for a constitutional violation? I think. In terms of the reasonableness? I think, Your Honor, on these unique facts, the failure to warn and the failure to call for backup combined together on these unique facts, and the fact that Stephen was 25 feet away, the fact that this interaction lasted for a minute and 10 or 11 seconds, the totality of those circumstances, it would be my answer to Your Honor's question. What's your best legal support for that proposition in the case law? Okay, I will turn to that. Your Honor, I guess my response would be many of the cases that we cited, especially on failure to warn, Dior versus Rutherford, and I'm probably butchering the first part of the plaintiff's name, where the court held warnings should be given when feasible, and the failure to give such a warning is a factor for the court to consider. How do you apply that to a failure to call for backup claim? Your Honor, in my understanding of the case law, in particular Forrester v. San Diego, a Ninth Circuit opinion from 1994, it says the court is not limited to the facts because the facts in each case are different, and the way that I would apply that here is the facts in this case are different insofar as in Dior, in fact, I believe there were multiple officers at the scene, and this particular officer that shot the beanbag in Dior, shot the beanbag projectiles and hit the man in the face, the officer was found to have acted unreasonably and used excessive force and acted in an unconstitutional manner. So I would combine the failure to call for backup with the failure to warn in these particular cases, in this particular case, and analogize it to Dior, analogize it to trying to find the other case. Dior is a little different factually, isn't it? It is, Your Honor. There was backup present. The event transpired over a fairly long period of time. It did. That's not what Dior, it's instructive, because factually with Dior, he had, I believe, dropped numerous weapons in the intervening time leading up to the officer's use of the beanbag projectiles. He had, I believe, a bow, a crossbow at one point, and at the time that he was approaching that officer in particular and walking at a steady gait, he had in his hands a can and or a bottle, it's unclear based upon the opinion which it was. And he, too, was not warned prior to the use of excessive force. When, I think as the Ninth Circuit wrote, writing the opinion, said for the shooting officer that Dior had approached some magic line, some demarcation established in the officer's own head, that was when he was going to use the beanbag projectile. And that, I believe, the Ninth Circuit concluded was not proper because he should have warned him he would have been shot had he passed that magic threshold. I thought, and I may be wrong about this, I thought Mr. Peterson was asked to show his hands and get on the ground? He was asked to do those things. And what was his response? Your Honor, he kept his left hand in... I'm not asking you where he kept his hands, I'm asking you what was his response? His response was he did not remove his hand from his sweatshirt pocket. I thought it was going to happen. Yes. Yes, that's correct. Well, you know, we're talking now about all these facts related to reasonableness. The district court said that there were factual issues on this point, but ultimately concluded that the law was not clearly established. And that we haven't really hit on that point. Sure. I'm sure your colleagues will dispute whether there were factual issues that would be raised as reasonable. So let's just assume the district court was right on that point. Why, in your view, was the district court wrong on the clearly established law prong of qualified immunity? Your Honor, with respect to the clearly established prong, the district court itself, and I cited these two cases, Osling v. the City of Bainbridge Island and Glassman v. the City of Lakewood, had previously itself ruled, and of course district court opinions are informative to establishing the law itself, that if there, in those two cases he found, Judge Leighton found, that there were disputed facts on the issue of unreasonableness of the use of force. And that he concluded that if excessive force was used, a constitutional right was violated, and that right was clearly established before the events giving rise to this action. And the Ninth Circuit itself has said, in Espinoza v. San Francisco County in 2010, when material issues of disputed fact exist as to whether force was used, the force used was excessive, those facts are also material to a proper determination of the reasonableness of the officer's belief in the legality of their actions. I would turn the court to, I'm going to just list them because I'm already tipping into my time, my rebuttal time. A reasonable officer is on notice that he can't use deadly force on a subject who's 25 feet away, not attempting escape, not brandishing a weapon, and not posing an immediate threat to the officer or others. That's Diorl, that's Glenn v. Washington. Reasonable alternatives short of the use of force should be used, Smith v. City of Lakewood, Judge Slayton's own district court decision, the individual in that case is literally committing felonies in front of the officer. And in that case, that individual, that subject, was granted his day in court. Your Honor, I'll reserve the balance. Thank you. Good morning. Michael Patterson on behalf of Lewis County and Matthew McKnight. I will agree with one thing and that is that the facts are very important in this case. They're unique facts and when you take a look at all the case law, both in the Ninth Circuit and other circuits in the United States Supreme Court, what really comes down and what's crucial to these determinations here is from a perspective of a reasonable officer, was Mr. McKnight's or Deputy McKnight's actions objectively reasonable? And it's from the perspective of that reasonable officer and the light most favorable to Peterson. And I submit to you the gram factors, A, the severity of the crime at issue, and if we took a look at the background and what Deputy McKnight knew at the time, he knew that this gentleman, who by the time that he shot him was recognizing that this was one and the same individual, that had been at a house, had had a knife. Stop right there. What's the evidence that he recognized he was the same individual? Well, part of the record, Your Honor, is in the depositions that were submitted, that at that point in time, given the description of the clothing that he was wearing, the footsteps that were identified leaving the house and going towards Meadowdale, and the fact that this was within five to six blocks, and he was in the street. And by the way, Mr. Peterson had left his vehicle back there, which was another key issue. But the... What does that have to do with what the officer knew? Did the officer know he left his vehicle there and it was his vehicle? He knew that he was on foot. No, no, no. That he had arrived. Okay. You have to answer the question, not keep reciting a bunch of facts. Did the officer know that he left his vehicle, assuming it's even important, that he left, that this individual, who's now on the street, left his vehicle at the scene of the crime? No, that's not clear, Your Honor. So that's why it's, you know, it doesn't help us. I understand. So let me, let me zero in on... So let me ask you, he says himself he didn't have probable cause to arrest. If we say, well, it's not his subjective view, we have to look at the objective view. Are you taking the position that when he saw this individual, that he had probable cause to arrest him? Not when he saw him initially, but at the point in time where he became non-compliant, and non-compliant, which has been corroborated by Carly Pinkerton, where she specifically says, I heard him say, and it got louder and louder, and he was yelling, stop, show me your hands. Now, is Pinkerton the one who changed her testimony? No, that was Ryan. That's Ryan. But Pinkerton was very clear, it got louder and louder, stop, show me your hands. She said, he said that at least four times, maybe five. And then you have Mr. Medeiros, who is saying, yes, and I heard him yell, get down, twice. There was no compliance, and in fact, there was defiance in that he said, it ain't going to happen, buddy. So at that point in time... So at that point in time, he has authority to use deadly force without warning? No. What's your best authority for that? Best authority for that, Your Honor. Deadly force without warning. Deadly force without warning, Your Honor. My best evidence on that are Tennessee versus Garner. Excuse me, Billington, Scott versus Harris. And the warnings were already given. In other words, stop, get down, let me see your hands. Now, he didn't add, I'm going to shoot you. But I submit to you that at that point in time, he wasn't going to shoot him. It's only when his muscles tightened up and he moved towards the officer that he indeed made the decision to shoot him. And it's based upon that split second timing, one minute, 11 seconds from the time that he gets out of his vehicle. But at that point in time, that was a matter of five seconds or so. Can an officer, there's no suggestion there was a weapon here, right? Yes. Did the officer see a weapon? He did not see a weapon, but that's the point on his commands to get your, show me your hands. So he had no reason to think there was a weapon, did he? Yes, he did. What was that? It was the fact that he had been monitoring the 9-11 call and that the report was that he had used a knife to stab... Someone had used a knife. Someone had used a knife. He, at that point in time, he reasonably believed it was him, had stuck it through and actually tried to stab an individual by the name of Jared. But he didn't see a knife at the time. He did not see a knife, but his hand, left hand remained in his pocket the entire time, despite him saying four, maybe five times, show me your hands. And the exhibit, by the way... Do you disagree with the district court who said that the court can't say as a matter of law whether the use of force was reasonable? And I think it's interesting that if you take a look at... So, you know, when I ask these questions, that calls for a yes or no. Now, maybe you disagree with him. I mean, I don't know what the answer to your question is, because you're about to launch on something else. Let me just ask it again. I wanted to put it in context. Let me just ask it again. Yes. And you can listen. Do you disagree with the district court's determination that the court cannot say as a matter of law whether McKnight's use of force was reasonable? I would agree with that. Okay, so then, if that's the case, does the qualified immunity standards turn to the question of whether the law was clearly established at that time? It does. Okay, so really, both as to your opposing colleague and you, you keep arguing what is a point that seems that everyone agrees on, that there was factual issue on the reasonableness. So probably would help us if you could enlighten us as to why, in your view, the court did not say at that time. Well, Your Honor, if we take a look at the arguments that are being made here, one is that he should have called for backup. Okay, interestingly, the court said, notably, plaintiff does not argue that McKnight should have called for backup after Steven started to advance towards him and the need for force materialized. Thus, calling for backup was not an argument at that point. Too late at that point in time. And that backup only came as a result of their expert, Van Blericombe, and that very argument was made in the Billington case and rejected. And once again, I'm submitting to you that the warnings were given. They weren't, he didn't say specifically, I'm going to shoot you, but the warnings were given, show me your hands, get down. And there was a defiance to that. And there are sufficient warnings were not constitutionally mandated, and I think that's supported by the Williams case here in the Ninth Circuit and Scott v. Harris, a U.S. Supreme Court case. The next argument is were there reasonable alternatives, and I think Scott v. Heinrich, Ninth Circuit case answers that. They weren't, officers are not required to use least intrusive method or required to do anything other than make sure the conduct. And Tennessee v. Garner and Scott v. Harris, I think both stand for the proposition that you are to give that warning that you're going to shoot if practicable or feasible. Well that all suggests the law was established on that point, but was the law not also established that if you don't have probable cause to arrest and you have the equivalent of a Terry stop, that you have a reasonable force? Although that may be a factual question as to whether any was used. And he was using, he wasn't using any force at that particular point in time. None. Of course not, not till he shot him. But things escalated from that point. The question is, at that point in time did he have probable cause to arrest him for the crime at issue? At the point in time he got out of his vehicle? No, at the time he shot him. Yes. And what was the probable cause at that point? Probable cause was that he was defying the lawful orders of a police officer. So if you defy an officer, police officer, the officer can shoot you? Well, given the context of this case. I actually didn't know about that. I mean, I don't even have to talk to the police. I'm walking down the street, Seattle police officer comes up and said, hey ma'am would you, I would like to talk to you. I said, okay. Is that going to happen? He can shoot me? No, and I didn't say that. I said that when you combine all of the factors here, him knowing the background of the situation, him believing that he had a knife in his left hand in his pocket that he wouldn't expose, him not complying with show me your hands, him not complying with get down, and at that point in time the defiance, that ain't going to happen buddy. But then you have to combine that. Isn't that just the Terry stop? You just described the classic Terry situation. So it seems like your argument is that you can shoot somebody to affect a Terry seizure. No, but this isn't. What am I missing here? This isn't a standard Terry stop because there was much more happening that this officer knew about at the time that the stop was made. But you're arguing, I think what you're arguing to Judge is that he got out of his car and the probable cause for an arrest developed based on what happened after he got out of the car. Well, it sounds to me like all that happened when he got out of the car was the need for, at most, a Terry seizure. The question is, can you affect the Terry seizure against the non-compliant subject by shooting him? At that point in time, he reasonably believed that this was one and the same person that he had been hearing the communications under 9-11 on. One and the same person who tried to stab somebody who was acting totally out of control at a house and was on foot. At that particular point in time, he knew that, at least he made that connection on a more problematic basis. Then it escalated and it escalated to the point where he believes that he has a knife. So really your argument is not that he had a probable cause, but that he made a reasonable mistake, if at all, as to the existence of probable cause. No, and I wouldn't say that. You wouldn't say that? I thought it was pretty helpful to you. I don't think he made a reasonable mistake. But if he made a reasonable mistake, then you win, don't you? And you'd get qualified immunity. Correct, but I don't think that were the facts under this case. I mean, nobody's saying that he says, wait a minute, you know, I didn't believe that was Peterson. I think the record is clear that at that point in time, given the description of the clothing, given the description of the footprints leaving from Meadowdale, and the fact that he was out in the roadway at that particular point in time, and his connecting that up made sense to him and made probable cause. So your clearly establishment argument is, this is sui generis, which of course is a defendant's argument in every qualified immunity case. There just isn't a case in the Ninth Circuit sufficiently close to this, failure to back up, failure to give an explicit warning, there just isn't any case law out there that will get the plaintiff here over the line. Not that I have been able to see, Your take a look at, you know, taking a look at the evidence in the light most reasonable and favorable to Peterson. That's what... Which of course we do, of course we do. And that's what this court did, and I'm talking about Judge Layton did. If you take a look at his order, they make a big issue with regard to the wallet. They make a big issue with regard to Ryan's statement. And I submit to you that he says, yes that was some background information I looked at. That was information I looked at with regard to whether or not I believe there was summary judgment grounds for excessive force. But when he gets into the qualified immunity, he does not repeat those same facts. He only repeats the facts that are objectively reasonable to this officer. And he doesn't go in and you know about this wallet and everything else. And I submit to you, I think that's a it's a red herring with regard to the wallet. He says that he was waving his right hand. The only one that says this is their expert, and it's only after the fact. And nobody knows what he had in that right hand. The concern was that he had his left hand in his pocket, and with the background information that McKnight had, he believed that he had a knife. And he would not pull it out of that pocket. And in fact, he wouldn't take his hand out of the pocket. And in fact, if you take a look at the exhibit, and I think it's a 305, but it's it's one where he's on the ground after he shot, his hand is still in that left pocket. It never came out of that left pocket. So your Honor, with regard to the objective reasonableness of this officer, I submit to you that he had every grounds to shoot at the point in time that he shot. It was escalating very quickly with the background information that he had. And he had reasonable objective, reasonable standards to do what he did. And that there's no Ninth Circuit or U.S. Supreme Court's case exactly on point here that would indicate that he broke constitutionally standards that would have violated that conduct. And I would ask that you affirm. Thank you. Your Honor, I'd like to, Your Honors, I would like to pick up on a point that was made earlier. Mr. McKnight had probable cause to arrest Mr. Peterson for the attempted burglary that happened moments earlier. I'd refer you to the record at page 113 where McKnight states he was conducting a Terry stop. And he also states that at that same page that he didn't have probable cause to arrest Mr. Peterson. And the reason why he in large part Although that we would judge objectively, not by the officer's subjectivity. Correct. Correct. And the reason why, of course, I'm stating the obvious, in order for any one of your Honors to even sign a warrant for someone's arrest, you have to have probable cause that this is the person. He didn't have probable cause. He had a reasonable articulable suspicion that an individual, Mr. Peterson, may have been involved in criminal activity. And that's it. So I think the argument that counsel made was maybe more refined on that point. And that is, well, maybe he didn't have probable cause about the mobile home and smashing on the door. But by the time he's 20 feet away and the officer says, stop, take your hands out of your pocket, that he doesn't do it, that then he changes. And now he has probable cause to arrest him for something else. But the something else would, I submit, at best, under the laws of the state of Washington, and I can't take off my former prosecutor hat, would be obstruction, a misdemeanor. And it would be hard for me to fathom that a court would say it is a proper exercise of force and that the law is clearly established that an officer may shoot and use deadly force against an individual for committing a misdemeanor. If this were to go to trial, would he have the defense that, well, even if that's true, he made a reasonable mistake? I don't believe so, and here's why. The cases that were cited by Lewis County to the court on mistaken belief, for instance, involved the Milstead case, a Fourth Circuit case, where it was a chaotic burglary scene with multiple persons with gunshot wounds, and the officer shot a subject running towards him from the house because he believed it to be the intruder. Or the Utiland case, a Sixth Circuit case, and again, these are cited in Mr. Patterson's briefing to the court, where this officer shot a schizophrenic man armed with a butcher knife who attacked the officer with the knife and struggled with dad for control of the knife. And in those cases, those circuits determined that the officer was immune from suit based upon those chaotic circumstances. Here, I don't believe those cases are instructive here, because really what this case stands for at the end is this, as according to Judge Layton's ruling, which we're respectfully asking that you reverse. That an officer, in the midst of a Terry stop, with a subject 25 feet away, who is simply not complying with commands, saying, it's not going to happen, buddy, who has in his hand, in the facts most reasonably inferred in our favor, has in his hand his wallet, as if to show identification, because he had not yet been identified. Does the law require an officer faced with circumstances which are susceptible to an innocent interpretation from the ultimate victim's point of view, or a dangerous, threatening situation from the officer's point of view? Does the law require that the officer assume the innocent explanation? The officer in that particular moment? It's a hypothetic. Sure. In any circumstance, where standing afar, someone could say, well, one interpretation was that this was a young man trying to get his wallet out and identifying himself. On the other hand, a reasonable person might say, this was an individual, later determined to have a substantial amount of methamphetamine in his system, reaching in his hand when the officer believed that he was indeed the person who used a knife trying to get in the door. What I'm asking is, does the law require us to tell the officer he must assume the innocent explanation? It's hard for me to answer that hypothetical. I believe how I would respond was the law requires objective reasonableness when viewing the officer's actions. And the objective reasonableness in this case necessarily has to include the fact that this is a Terry stop. But here, the individual not only did not comply with the officer's command, he advanced on the officer. Yes, he took two steps. You're right. He didn't stop. And he did not stop. He continued to move toward the officer. He did, Your Honor. And I would point you to the record in terms of the autopsy findings. You can see the trajectory. His hand was out. We know the wallet was at his side. We also know that, according to our expert with the police spotlight, it would have been blinding him. He couldn't have seen, as our expert testified, the weapon drawn. And my thought just completely escaped me there. I was going to say one more thing. Your Honor. Okay. Thank you. Thank you so much. I'd like to thank all counsel for your argument this morning. The case of Peterson v. Lewis County is submitted.
judges: Hawkins, McKeown, Davis